AO 106 (Rev. 04/10)  Application for a Search Warrant

*AUSA Jessica Kim*

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

The cellular telephone assigned call number
614-756-9477, with International Mobile Subscriber
Identity: 310410045434583

)
)
)
)
)
)

Case No. 19 mj 663

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B and/or attached Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 242 | Deprivation of rights under color of law |
| 18 U.S.C. 1951 | Hobbs Act extortion |
| 18 U.S.C. 1503 | Obstruction of justice |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert D. Bogner, Task Force Officer, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8-23-19

_____
*Judge's signature*

City and state: Columbus, Ohio

Hon. Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

FILED
RICHARD W. NAGEL
CLERK OF COURT
2019 AUG 23 AM 10: 06
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
EAST DIV COLUMBUS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **614-756-9477**, WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY: **310410045434583** | Case No. _____<br><br>Filed Under Seal |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Robert D. Bogner, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **614-756-9477**, with International Mobile Subscriber Identity/Electronic Serial Number **310410045434583** ("the TARGET CELL PHONE") whose service provider is **AT&T**, a wireless telephone service provider headquartered at **11760 US Highway 1, Suite 600, N. Palm Beach, Florida 33408**. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.     Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-

3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am an Inspector with the Ohio Auditor of State (AOS), where I have worked since February 2015. As an AOS Inspector, I am responsible for conducting criminal investigations involving theft, theft in office, public corruption, and other violations of law. Since February 2017, I have been deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI), Columbus Resident Agency for the Southern District of Ohio, Eastern Division. I am currently assigned to the Public Corruption Squad. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.      Prior to working as an AOS Inspector, I was a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) for 28 years. During that time, I investigated violations of the Internal Revenue laws and related offenses and was involved in numerous investigations involving violations of the United States Code. I have provided financial investigative expertise and assistance to various federal and local agencies, including the FBI, Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, and Firearms (ATF), and the Columbus Division of Police Narcotics Bureau.

5.      During my tenure as a Task Force Officer with the FBI, I have been assigned to work on various types of investigations, including public corruption, financial crimes, violent crimes, narcotics offenses, and money laundering. I have experience in the execution of search warrants and the debriefing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience in the use of sophisticated

2

investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps.

6.    I, along with other agents and officers from the FBI, the Columbus Division of Police (CPD), the Ohio Bureau of Criminal Investigation (BCI), and the Ohio Auditor of State (AOS), have been investigating corruption in the Columbus Division of Police Department's Vice Unit involving CPD Vice Unit Detectives Steven G. Rosser and Whitney R. Lancaster. Over the course of this investigation, I have become familiar with the organization and structure of the CPD Vice Unit, as well as the nature and scope of the CPD Vice Unit's duties.

7.    The facts set forth in this affidavit come from my personal observations, my training and experience with this investigation, as well as investigative reports and information provided to me by other federal and state law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1951 (Hobbs Act extortion), 18 U.S.C. § 666 (theft or bribery concerning programs receiving federal funds, 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1503 (obstruction of justice) have been committed by Columbus Police Department ("CPD") Vice Unit Detectives Steven G. ROSSER and Whitney R. LANCASTER. There is probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will further lead to the identification of additional individuals who are engaged in the commission of these offenses.

9.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

10.      As briefly discussed above, the United States, including the FBI, is conducting a criminal investigation of Steven G. ROSSER and Whitney R. LANCASTER regarding possible violations of 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1951 (Hobbs Act extortion), 18 U.S.C. § 666 (theft or bribery concerning programs receiving federal funds, 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1503 (obstruction of justice). Based on my training and experience, as well as information obtained from (i) interviews with sources of information and other witnesses; (ii) investigative reports and arrest records; (iii) federal and state law enforcement officers; (iv) public database searches; and (v) the ongoing investigation of the CPD Vice Unit in this district, I am aware of the following facts.

## Operational Background of CPD Vice Unit

11.      The CPD Vice Unit is charged with enforcing, among other things, prostitution-related offenses, liquor-control offenses, and compliance checks in night clubs, after-hours clubs, and adult entertainment venues. Many of these offenses are misdemeanor violations under the Ohio Revised Code. Because of the nature of the offenses, and the types of crimes being investigated, CPD Vice Unit detectives are given a broad amount of latitude while performing their duties.

4

## Background of Targets

12.     Whitney R. LANCASTER has been a CPD officer for at least thirty years. Prior to being relieved of duty on or about December 13, 2018, LANCASTER was assigned as a detective in the CPD Vice Unit as a nuisance abatement officer; a position that was created about a year and a half ago.

13.     Steven G. ROSSER has been a CPD officer since 2000. On or about April 13, 2013, ROSSER was assigned as a detective in the CPD Vice Unit. Prior to being relieved of duty on or about October 31, 2018, ROSSER was assigned as the liquor compliance officer/liaison on approximately January 31, 2017.

14.     Although LANCASTER and ROSSER were officially assigned to separate shifts under separate sergeants, the investigation has revealed that they were frequently permitted by their lieutenant to work nuisance abatement and liquor compliance issues together. Investigators have learned LANCASTER and ROSSER frequently initiated Nuisance Abatement Group (NAG) inspections on clubs to apply pressure on club owners for their personal purposes, as detailed below.

15.     In or about August 2015, the FBI initiated an investigation into ROSSER after receiving information ROSSER was using his official position to assist certain owners of night clubs and adult entertainment clubs to avoid criminal charges, state and city permit violations, and also closed clubs of competitors in exchange for cash and special favors. More recently, the FBI learned LANCASTER had been participating in these activities with ROSSER.

## Criminal Investigation Involving Kahoots

16.     Based on source debriefs and multiple recent witness interviews, investigators have learned ROSSER and LANCASTER conspired to engage in a pattern of corrupt activities.

For example, beginning in or about September 2017 through at least the summer of 2018, ROSSER and LANCASTER conspired to force the owner of Kahoots, an adult entertainment club, to rehire a fired champagne room host, Jeremy Sokol, who was fired after he was caught weighing marijuana in Kahoots and significantly overcharging customers' credit cards. After Sokol was rehired, multiple dancers came forward alleging Sokol was extorting girls for money, selling drugs, and pimping girls out. Investigators learned from these sources and witnesses that LANCASTER and ROSSER used their official positions to execute citations against individuals who were named by Sokol and who were either (a) complaining about Sokol's illegal activity; or (b) posing a threat to Sokol's continuing illegal activities. LANCASTER and ROSSER used these citations as leverage against club owners, forcing them to rehire Sokol and to fire other individuals who Sokol, LANCASTER, and ROSSER deemed to pose as a threat in upending Sokol's criminal activities. Investigators have further learned that many of the individuals who were cited by LANCASTER and ROSSER had their charges thrown out and criminal records expunged.

17.     Multiple witnesses and sources reported to investigators that after Sokol returned to work at Kahoots, he bragged about how the club was now "protected." One source told investigators that Sokol bragged that he, ROSSER, and LANCASTER all utilize "burner" phones to communicate. This same source further told investigators that LANCASTER's brother operated an after-hours club, was a well-known drug user/dealer, and that LANCASTER shut down after-hours clubs that were competitors of his brother's after-hours club. This source also heard through some of the dancers at Kahoots that Sokol had shown them text messages Sokol had received from an Ohio Liquor Control Agent, "Darin LNU" (believed by your Affiant to be Darin Plummer), that illustrated how Sokol received advanced notification concerning potential

enforcement action at Kahoots. The source added that Darin LNU was LANCASTER's "tip off guy."

## Criminal Investigation Involving Witness 1

18.    In addition to the activities involving Kahoots described above, investigators have also learned ROSSER and LANCASTER have a special relationship with club owners Jacques Diallo (a/k/a Baba) and Nick Jgenti, as well Diallo's and Jgenti's associates. These individuals have been involved with multiple after-hours clubs and adult entertainment venues. The investigation has revealed that Diallo and Jgenti are close associates, and are also involved with Mexican males associated with the Sinaloa Cartel.

19.    The investigation has further revealed that LANCASTER is a close associate to Jgenti and Diallo. Diallo and Jgenti are associated with the Dollhouse, an adult entertainment club. Investigators spoke with a Dollhouse employee (Witness 1) who said she was approached in the Dollhouse by Diallo on or about April 13, 2018. Diallo asked Witness 1 if she wanted to accompany him to pick something up for the Dollhouse. Witness 1 walked out of the Dollhouse with Diallo to a silver sedan being driven by "Sonny" (known by your Affiant to be Whitney LANCASTER aka Sonny LORENZE and later verified by Witness 1). Witness 1 entered the back of the silver sedan and Diallo entered the front passenger side; no other individuals were in the vehicle. LANCASTER drove Witness 1 and Diallo on SR 161 towards Little Turtle Golf Community to a nice house in a neighborhood located off of SR 161. Investigators know this to be in close proximity to where LANCASTER's late brother, Todd Lancaster, a known drug trafficker, resided before he was shot and killed on or about April 13, 2018.

20.    When they arrived at the house, LANCASTER and Diallo told Witness 1 they were going into the house to retrieve items of value before police arrived. Witness 1 recalled

7

there were signs of evidence tape around the house, as if the house had recently been treated as a crime scene. (Your Affiant believes the house was the residence of Todd Lancaster, LANCASTER's recently deceased brother.) Witness 1 did not know why they brought her, but thought maybe she was supposed to serve as a lookout for the police. Witness 1 remained in the vehicle when LANCASTER and Diallo went into the house. When LANCASTER and Diallo got back in the car, LANCASTER was crying and saying they couldn't find what they were looking for. When they arrived back at the Dollhouse, Witness 1 observed LANCASTER approach Jgenti crying, saying he couldn't believe they killed him. Witness 1 told investigators that Jgenti seemed to know what LANCASTER was talking about. Both Jgenti and LANCASTER appeared upset.

21.     Witness 1, in addition to other witnesses, has told investigators that LANCASTER was frequently in the Dollhouse drinking and talking with Jgenti, and that LANCASTER held the wake for his brother, Todd Lancaster, at the Dollhouse.

22.     A former girlfriend of Jgenti's ("Witness 2") has further corroborated the information described above. Witness 2 told investigators that she knew Todd Lancaster was a drug dealer, that Todd Lancaster and Jgenti had some dealings with one another, although they did not get along well, and that Jgenti attended Todd Lancaster's funeral. According to Witness 2, she learned from Jgenti that ROSSER followed LANCASTER, Diallo, and Witness 1 to Todd Lancaster's house that night described above.

23.     Your Affiant believes, given Todd Lancaster's association with Jgenti and his drug trafficking activities that LANCASTER, Diallo, and ROSSER were possibly attempting to remove evidence from the scene of Todd Lancaster's murder that could implicate LANCASTER, Jgenti, or Diallo in a drug trafficking conspiracy and/or other criminal activities.

### Criminal Investigation Involving Witness 2 and Arrest of Armenak Stepanian

24.     Witness 2 has provided information to investigators regarding another incident involving LANCASTER's and ROSSER's corrupt activities. According to Witness 2, LANCASTER, ROSSER, Jgenti, and Yelena Nersesian (a part owner of the Dollhouse), conspired to plant cocaine on Armenak Stepanian, Nersesian's ex-husband and former partial owner of the Dollhouse, and have Stepanian arrested in order to coerce Stepanian into giving up his ownership interest in the Dollhouse.

25.     The investigation has revealed Stepanian was arrested for possession of cocaine (lab results pending) in the early morning hours of April 20, 2018. ROSSER subsequently prepared a CPD Form U-10-100 detailing the arrest of Stepanian for suspected possession of cocaine. Investigators have noted several inconsistencies in ROSSER's report. For example, although ROSSER claims in his report that he interviewed Witness 2 and she stated that she witnessed Stepanian in possession of cocaine that evening, Witness 2 denies ever making such statements. Witness 2 told investigators that ROSSER pretended to interview her, but it was simply a show for everyone else that was around and that no questions were truly asked.

26.     Investigators also interviewed two uniformed CPD officers who responded to ROSSER's request for assistance at the Dollhouse that evening, revealing additional inconsistencies in ROSSER's report. In ROSSER's report, he claims that the purpose for the police action at the Dollhouse was to respond to afterhours drinking. (ROSSER also claimed this to CPD dispatch when he initially requested uniformed officer assistance.) According to the two uniformed CPD officers, however, upon arriving at the Dollhouse, ROSSER briefed them that they were responding to arrest an individual who was trafficking cocaine.

27.     The two uniformed CPD officers, as well as other witnesses, further told investigators that ROSSER went straight back to Jgenti's office in the Dollhouse and arrested Stepanian that evening.  At least one witness recalled ROSSER specifically asking where Stepanian was located.  This is inconsistent with what ROSSER detailed in his report, in which he indicated he was at the Dollhouse to determine if there was afterhours drinking, but happened upon Stepanian in the presence of cocaine.  ROSSER's report further detailed how he observed no open alcohol in the bar and how the crew was cleaning up for the evening, thereby removing any criminal culpability for Jgenti, who was serving as the general manager at the Dollhouse that evening.

28.     According to Witness 2, on the evening of Stepanian's arrest, Jgenti handed Witness 2 the cocaine Stepanian was later arrested for, and directed her to put the cocaine out on the desk in Jgenti's office.  Prior to Stepanian going into the office with Jgenti, he was at the bar having a few drinks waiting to meet with Jgenti for a pre-determined meeting in Jgenti's office about Stepanian's interest in the Dollhouse.  Jgenti went to the bathroom almost immediately before ROSSER came in and arrested Stepanian, which Witness 2 later realized was part of the plan to place possession of the cocaine solely on Stepanian.  Witness 2 exited the office just before ROSSER entered the office to arrest Stepanian.  According to Witness 2, ROSSER gave a head nod and winked at Witness 2 as he entered the office to arrest Stepanian that night.

29.     On the night of Stepanian's arrest, Witness 2 observed LANCASTER circling the Dollhouse in his vehicle.  According to CPD records, LANCASTER was on sick leave from April 16, 2018 through April 20, 2018, due to a death in his family, and had not yet reported back on duty.  One of the uniformed CPD officers present at the scene described a black male matching the description of LANCASTER who was also present, corroborating Witness 2's

10

account of observing LANCASTER that evening. ROSSER's report never mentions LANCASTER.

30.    According to Franklin County Court records, on or about October 23, 2017, Stepanian filed a complaint with the Franklin County Court of Common Pleas against Yelena Nersesian and the Dollhouse. Court records further detail that on or about May 17, 2018, Stepanian and Nersesian went before the court, at which time Stepanian withdrew his complaint and gave up his partial ownership of the Dollhouse to Nersesian. The timing of this is significant, given that it occurred approximately 27 days after Stepanian's arrest on April 20, 2018. According to Witness 2, she knew ahead of time that Jgenti and Nersesian wanted Stepanian out of the Dollhouse; even discussing killing him. Witness 2 told investigators that Jgenti and Nersesian eventually decided to set up Stepanian with drug charges utilizing ROSSER.

31.    Investigators interviewed Stepanian on or about December 19, 2018. According to Stepanian, after his arrest, both Nersesian and Jgenti told him to get out of the Dollhouse. Stepanian gave up his 33% interest in the Dollhouse and, in exchange, was given a club in Dayton by Nersesian. Stepanian told investigators that he believed his arrest for cocaine possession would have been used against him, making him ineligible to own another liquor establishment, if he did not give up the Dollhouse. Stepanian later received a text message from Witness 2 on or about early September 2018, in which Witness 2 told Stepanian he had been set up by Nersesian and Jgenti.

32.    Your Affiant knows, based on call detail records received via grand jury subpoena, that the assigned cellular telephone number 614-756-9477 (the TARGET CELL PHONE, known by your Affiant to be ROSSER's personal cell phone number) was in contact

11

with LANCASTER's phone at least 9 times from 11:49pm on April 19, 2018, through 4:50am on April 20, 2018, thus placing LANCASTER and ROSSER in contact throughout key times of the conspiracy to plant cocaine on and arrest Stepanian.

## Theft in Office and Wire Fraud Special Duty Pay

33.     Investigators are continually developing facts surrounding a conspiracy between multiple members of the CPD Vice Unit, most significantly ROSSER and LANCASTER, who investigators are learning either filed false special duty reports and/or fraudulent time sheets with the City of Columbus and/or Fort Rapids Indoor Waterpark Resort ("Fort Rapids"), located at 4560 Hilton Corporate Drive Columbus, Ohio 43232, claiming the same or overlapping hours worked at both jobs.  Investigators have learned of significant checks going into ROSSER's and LANCASTER's bank accounts from a Fort Rapids stakeholder located in California.

34.     Investigators first learned of ROSSER's special duty involvement with Fort Rapids when it was discovered that significant checks were being written to ROSSER from two individuals associated with the California-based company.  For example, ROSSER received three (3) checks for $10,080; $4,032; and $3,456 on February 10, 2018; June 12, 2018; and August 30, 2018, respectively.  Investigators approached CPD and inquired about the discovery of these special duty checks going into ROSSER's account, and CPD agreed the amounts seemed significant and began looking into the matter.

35.     Investigators learned from CPD that special duty for Fort Rapids began with ROSSER on or about January 3, 2018; the day after a water pipe broke and flooded Fort Rapids for about seven hours causing severe damage to the Fort Rapids building that was closed indefinitely as a result of multiple health code violations.  Due to the building damage, Columbus Fire Department (CFD) required a 24 hours/day fire watch consisting of two man

12

shifts to be maintained on the Fort Rapids building until the required repairs were made to the building.

36.     After failed attempts to engage a number of security companies, the Fort Rapids representative reached out to ROSSER to ask if he could provide 24-hour security on the building.  On or about January 4, 2018, ROSSER emailed the representative indicating the email represented the contract between Fort Rapids and the CPD officers who would be conducting special duty at Fort Rapids.  At which point, ROSSER became the special duty point of contact (coordinator) who hand-signed (*i.e.*, approved), scanned, and emailed the billing invoices to the Fort Rapids representative.

37.     Investigators reviewed the special duty "Fire Watch Log Sheets" retrieved from ROSSER'S CPD office and billing invoices ROSSER submitted to the Fort Rapids representative.  When the said records were compared to the CPD time and attendance records, investigators discovered that ROSSER and LANCASTER worked 152 hours and 180 hours of special duty, respectively, while also claiming to be working their CPD assignment. This is not including hours ROSSER and LANCASTER claimed to have worked that would have resulted in ROSSER and LANCASTER working twenty-four (24) plus hours straight without a break in some instances.  A review of bank records for the individuals involved with the California-based, Fort Rapids, company revealed from February 2018 through December 2018, ROSSER was paid approximately $55,728 and LANCASTER was paid $94,656 for special duty alone.

### Additional Ongoing Investigation

38.     Your Affiant knows, based on subscriber information and call detail records from AT&T, that the **assigned cellular telephone number 614-756-9477 is linked to a cellular phone IMSI #310410045434583 (the "TARGET CELL PHONE"), serviced by AT&T.**

ROSSER is known to be the user of assigned cellular telephone number 614-756-9477, based on (1) CPD's records; and (2) based on subscriber information showing the account billing address is 74 Greenhedge Cir, Delaware, Ohio 43015, which your Affiant knows to be ROSSER's home address.

39. On October 28, 2018, a pen register trap-and-trace device was judicially authorized on AT&T cellular telephone number 614-756-9477, being utilized by Steven G. ROSSER, for a period of sixty days which expired on or about December 21, 2018 (*see* 2:18-mj-796). On or about December 17, 2018, the order was renewed for an additional sixty days. On February 13, 2019, the order was renewed for an additional sixty days, which expired on April 14, 2019. On May 3, 2019, a new pen register trap-and-trace device was judicially authorized on AT&T cellular telephone number 614-756-9477 for sixty days (*see* 2:19-mj-356). On or about June 27, 2019, the new order was renewed for an additional sixty days (*see* 2:19-mj-356).

40. The judicially authorized pen register trap-and-trace device has captured ROSSER'S continuous phone contact via telephone calls and/or text messages with individuals who have been identified as potential co-conspirators and/or witnesses. Specifically, the pen register trap-and-trace device has continued to capture numerous phone calls and text messages between ROSSER and Jeremy Sokol, who witnesses have identified as an individual involved in criminal activities, including narcotics trafficking, bookmaking, and prostitution. Since the last order renewal, the pen register trap-and-trace device has captured the following calls/text messages between ROSSER and Sokol:

- June 28, 2019, 1:08 pm-4:56 pm- seventy-three (73) incoming/outgoing text messages.
- July 1, 2019, 5:02 pm-6:35 pm- twenty-three (23) incoming/outgoing text messages.
- July 7, 2019, 11:24 pm-11:59 pm - forty-seven (47) incoming/outgoing text messages.

14

- July 8, 2019, 8:01 pm-8:08 pm- eight (8) incoming/outgoing text messages, followed by an incoming call at 10:20 pm lasting 40:39 minutes.

- July 12, 2019, 6:39 pm-9:28 pm- thirty-five (35) incoming/outgoing text messages.

- July 15, 2019, at 8:25 am- an outgoing text to Sokol, followed by three outgoing text messages to Whitney Lancaster from 8:33 am-8:40 am, and then twenty-one (21) outgoing/incoming text messages with Sokol from 8:42 am-9:07 am.

- July 17, 2019, at 9:52:19 pm, an incoming text message followed by an incoming call at 9:52:47 pm lasting 17:20 minutes.

41.     The judicially authorized pen register trap-and-trace device has captured more recent, additional phone calls and text messages between ROSSER and Sokol.  In the past sixty days, the captured data has revealed three hundred fifty-three 353 text messages between Rosser and Sokol.  Eighteen (18) of the text messages between Rosser and Sokol were exchanged after a potential co-conspirator submitted to a voluntary interview with investigators on or about August 15, 2019.  The captured data has also revealed five (5) calls between Rosser and Sokol, the last of which was a 17:20 minute outgoing call on or about July 18, 2019.

42.     The captured data has also revealed forty-eight (48) calls between Rosser and co-conspirator CPD Officer Whitney Lancaster, one of which was a 20:08 minute call that occurred after investigators interviewed the potential co-conspirator described above on or about August 15, 2019.  Investigators are still attempting to identify and contact potential witnesses who have been revealed through telephone data to be in contact with Rosser.

43.     On or about May 30, 2019, a search warrant for location information of the cellular telephone assigned call number 614-756-9477 used by ROSSER (the "TARGET CELL PHONE"), whose service provider is **AT&T**, a wireless telephone service provider

15

headquartered at 11760 US Highway 1, Suite 600, N. Palm Beach, Florida 33408, was judicially authorized by the Court pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c), (*see* 2:19-mj-433). The warrant was authorized for thirty days, expiring on June 29, 2019. On or about June 27, 2019, the warrant was renewed for an additional thirty days, (*see* 2:19-mj-511), expiring on July 27, 2019. On or about July 25, 2019, the warrant was renewed for an additional thirty days, (*see* 2:19-mj-589), expiring on August 25, 2019.

44. The judicially authorized search warrant for cell-site location information for the TARGET CELL PHONE (described above) has been helpful in establishing ROSSER's location on numerous occasions. For example, days before and after the above-mentioned phone activity captured by the pen register trap-and-trace device, judicially authorized location information for the TARGET CELL PHONE established ROSSER's location near the Lewis Center residence of Sokol on June 30, 2019 and July 11, 2019. Investigators recently began an ongoing process of overtly contacting/interviewing individuals who have been identified as ROSSER's co-conspirators, close associates, and/or individuals associated with ROSSER's co-conspirators. As interviews continue to take place, investigators believe the interviewees will subsequently make contact with ROSSER and/or ROSSER's co-conspirators to arrange face-to-face meetings to discuss the interviews and potential strategies, resulting in possible witness tampering and/or obstruction of justice offenses. Therefore, this search warrant application seeks renewal and/or continuation of the previously authorized location information for the TARGET CELL PHONE for an additional thirty days.

45. In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information

16

about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

46.     Based on my training and experience, I know that **AT&T** can collect E-911 Phase II data about the location of the TARGET CELL PHONE, including by initiating a signal to determine the location of the TARGET CELL PHONE on **AT&T**'s network or with such other reference points as may be reasonably available.

47.     In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers

17

covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

48. Based on my training and experience, I know that **AT&T** can collect E-911 Phase II data about the location of the TARGET CELL PHONE, including by initiating a signal to determine the location of the TARGET CELL PHONE on **AT&T**'s network or with such other reference points as may be reasonably available.

49. Based on my training and experience, I know that **AT&T** can collect cell-site data about the TARGET CELL PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as **AT&T** typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

50. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

51.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the TARGET CELL PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

52.    I further request that the Court direct **AT&T** to disclose to the government any information described in Attachment B that is within the possession, custody, or control of **AT&T.**  I also request that the Court direct **AT&T** to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with **AT&T**'s services, including by initiating a signal to determine the location of the TARGET CELL PHONE on **AT&T**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall

reasonably compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

53.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELL PHONE outside of daytime hours.

54.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation

Respectfully submitted,

Robert D. Bogner
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on August _____ 23 _____, 2019.

Honorable Chelsey M. Vascura
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

1. The cellular telephone assigned call number **614-756-9477**, with International Mobile Subscriber Identity **#310410045434583** ("the TARGET CELL PHONE"), whose wireless service provider is **AT&T** ("the Provider"), a company headquartered at **11760 US Highway 1, Suite 600, N. Palm Beach, Florida 33408.**

2. Records and information associated with the TARGET CELL PHONE that is within the possession, custody, or control of **AT&T**, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

### I. Information to be Disclosed by the Provider

All information about the location of the TARGET CELL PHONE described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the TARGET CELL PHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **AT&T**, **AT&T** is required to disclose the Location Information to the government. In addition, **AT&T** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **AT&T**'s services, including by initiating a signal to determine the location of the TARGET CELL PHONE on **AT&T**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate **AT&T** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

2

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1951 (Hobbs Act extortion), 18 U.S.C. § 666 (theft or bribery concerning programs receiving federal funds), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1503 (obstruction of justice) involving **Steven R. ROSSER**.